**CENTRAL VALLEY CHRYSLER–JEEP, et al., Plaintiffs,**

v.

**Catherine E. WITHERSPOON, in her official capacity as Executive Director of the California Air Resources Board, et al., Defendants.**

**No. CV F 04–6663 AWI LJO.**

United States District Court,
E.D. California.

Sept. 25, 2006.

---

Andrew Brian Clubok–Pro Hac Vice, Derek Sterling Bentsen, Lucas Rames Blocher–Pro Hac Vice, Michael Edward Scoville–Pro Hac Vice, Stacey L. Bennett–Pro Hac Vice, Stuart A.C. Drake–Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, Timothy Jones, Sagaser, Jones & Hahesy, Fresno, CA, for Plaintiffs.

Raymond B. Ludwiszewski, Pro Hac Vice, Charles H. Haake, Gibson, Dunn & Crutcher, LLP, Washington, DC, Jon Wallace Upton, Kimble, MacMichael & Upton, Fresno, CA, for Association of International Automobile Manufacturers.

David Bookbinder, Sierra Club, Washington, DC, Ellen M. Peter, California Attorney General Office, Caryn Leigh Craig, California Dept. of Justice–Office of the Attorney General, Linda Lea Berg, Office of the Attorney General, State of California, Sacramento, CA, Marc Nathaniel Melnick, California Attorney General's Office, Oakland, CA, Kathleen A. Kenealy, Office of the California Attorney General, Los Angeles, CA, for Defendants.

**MEMORANDUM OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT AND DEFENDANT–INTERVENORS' MOTION FOR JUDGMENT ON THE PLEADINGS AND (2) LIMITING DISCOVERY OF GLOBAL WARMING SCIENCE DOCUMENTS**

ISHII, District Judge.

This case concerns the legality of environmental regulations imposed by a state administrative agency. Plaintiffs seek declaratory and injunctive relief on the basis that the regulations violate and are preempted by federal law. This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

### A. California Health and Safety Code § 43018.5

In 2002, the California Legislature enacted Assembly Bill Number 1493, codified at California Health and Safety Code § 43018.5. Section 43018.5(a) required the California Air Resources Board ("CARB") to "develop and adopt regulations that achieve the maximum feasible and cost-effective reduction of greenhouse gas emissions from motor vehicles." Section 43018.5 only authorizes regulations that apply to vehicles manufactured in the 2009 model year or after. Cal. Health & Safety Code § 43018.5(b)(1). "Maximum feasible and cost-effective reduction of greenhouse gas emissions" refers to reductions that are "[c]apable of being successfully accomplished within the time provided by this section, taking into account environmental, economic, social, and technological factors" and are "[e]conomical to an owner or operator of a vehicle, taking into account the full life-cycle costs of a vehicle." Cal. Health & Safety Code § 43018.5(i)(2).

At a public hearing in September 2004, CARB approved regulatory amendments ("California regulations" or "regulations") adding greenhouse gas emission standards to California's existing motor vehicle standards. *See* FAC Ex. A. CARB, through its normal process, ultimately adopted the regulatory language in its Resolution 04–28. *Id.*

CARB made factual findings to support its adoption of the regulations. CARB found that "[o]ver the past century the temperatures in the northern hemisphere have changed at a rate faster than at any other time over the last millennium, and that change is because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases and other pollutants." FAC Ex. A at 9. CARB further noted that "the global climate is changing at a rate

unmatched in the past one thousand years" and climate change is affecting California. *Id.* CARB found that the proposed standards would significantly reduce greenhouse gas emissions. FAC Ex. A at 14.

The regulations addressed four greenhouse gases: carbon dioxide, methane, nitrous oxide, and hydrofluorocarbons. Cal. Code Regs. tit. 13, § 1961.1(e)(4). The regulations weight the emission of each gas based on its "global warming potential." Cal.Code Regs. tit. 13, § 1961.1(e)(6). Compliance with the regulations is based on "fleet average" greenhouse gas emissions. Cal.Code Regs. tit. 13, § 1961.1(a)(1)(A). The average is defined separately for two categories of vehicles: (1) passenger cars and light duty trucks under 3,750 pounds, and (2) light duty trucks over 3,750 pounds and medium duty passenger vehicles. *Id.* The standards set emissions limits beginning in model year 2009 that become more stringent each year through 2016. *Id.* Manufacturers who fail to comply face civil penalties. *See* Cal. Health & Safety Code § 43211.

Manufacturers that meet the standards for model year 2009 or surpass the standards in any later year will accrue credits. Cal.Code Regs. tit. 13, § 1961.1(b)(1). These credits may be used to offset that manufacturer's emissions in a later year, may be transferred between vehicle categories, or may be sold to another manufacturer. *Id.* A manufacturer who does not meet the standards may avoid the civil penalty for noncompliance by offsetting their failures within a five-year period. Cal.Code Regs. tit. 13, § 1961.1(b)(3). Manufacturers can also comply by earning credits for using alternative fuels that produce lower greenhouse gas emissions. Cal.Code Regs. tit. 13, § 1961.1(a)(1)(B).

## B. The Clean Air Act

In 1963, Congress expanded its role in addressing air pollution by enacting the Clean Air Act. Pub.L. No. 88–206, 77 Stat. 392 (1963). Section 209(a) of the Clean Air Act, codified at 42 U.S.C. § 7543(a),[1] generally preempts state regulation of motor vehicle emissions. Section 209(b) provides an exemption to 209(a) for rules adopted by the State of California that receive a waiver from the Environmental Protection Agency ("EPA"). 42 U.S.C. § 7543(b)(1);[2] *see Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C.Cir.1996) (noting that, under the terms of section 209(b), "California is the only state that qualifies for the waiver, because it was the only state that had adopted emissions control standards prior to March 30, 1966"). In order to receive such a waiver, the state standards must be, "in the aggregate," at least as protective as federal standards. 42 U.S.C.

---

1. In relevant part, 42 U.S.C. § 7543(a) provides as follows: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."

2. In full, 42 U.S.C. § 7543(b)(1) provides as follows:

 The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new mo-

tor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—

 (A) the determination of the State is arbitrary and capricious,

 (B) such State does not need such State standards to meet compelling and extraordinary conditions, or

 (C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

§ 7543(b)(1). The EPA may deny a waiver if it finds that the state's determination is "arbitrary and capricious," that the state standards are not needed to meet "compelling and extraordinary conditions," or that the state standards are not consistent with 42 U.S.C. § 7521(a). *Id.* Though only California's regulations may receive a waiver, other states may elect to adopt such California standards under Clean Air Act section 177, rather than being governed by the federal scheme. 42 U.S.C. § 7507.

On September 8, 2003, the EPA concluded that "in light of the language, history, structure and context of the [Clean Air Act] and Congress' [s] decision to give DOT authority to regulate fuel economy under EPCA, it is clear that EPA does not have authority to regulate motor vehicle emissions of CO[2] and other [greenhouse gases] under the [Clean Air Act]." Control of Emissions from New Highway Vehicles and Engines, 68 Fed.Reg. 52,922, 52,929 (September 8, 2003). The District of Columbia Circuit upheld the EPA's decision, and the case is currently before the Supreme Court. *See Massachusetts v. EPA,* 415 F.3d 50 (D.C.Cir.2005), *cert. granted,* —— U.S. ——, 126 S.Ct. 2960, 165 L.Ed.2d 949 (2006).

On December 21, 2005, CARB requested that the EPA grant the California regulations a section 209(b) waiver, which the EPA has yet to provide. Defs.' RJN Ex. C.

## C. The Energy Policy and Conservation Act

Enacted in 1975, the Energy Policy and Conservation Act ("EPCA") established federal fuel economy standards for new vehicles. Pub.L. No. 94–163, 89 Stat. 871

(1975). The EPCA authorizes the National Highway Traffic Safety Administration[3] ("NHTSA") to set a minimum corporate average fuel economy ("CAFE") for a manufacturer's fleet of new vehicles. 49 U.S.C. §§ 32902(a), 32902(c).

The EPCA provides that the CAFE standards must be set at the "maximum feasible average fuel economy level." 49 U.S.C. §§ 32902(a), 32902(c). In setting the maximum feasible level, NHTSA "shall consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C. § 32902(f). This requires NHTSA to consider the effect on fuel economy of state regulations that receive an EPA waiver under Clean Air Act section 209. EPCA § 301, 89 Stat. at 905; *see* Light Truck Average Fuel Economy Standard, Model Year 2004, 67 Fed.Reg. 16,052, 16,057 (April 4, 2002) (to be codified at 49 C.F.R. pt. 533) (considering the effect of California's low emission vehicle regulations in setting CAFE standard). The EPCA contains an express preemption provision:

> When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

49 U.S.C. § 32919.

## D. This Lawsuit

On December 7, 2004, Plaintiffs[4] filed suit against Catherine E. Witherspoon,

---

**3.** The EPCA expressly provided that the Secretary of Transportation would administer the program. *See, e.g.,* 49 U.S.C. § 32902(a). The Secretary delegated these responsibilities to the National Highway Traffic Safety Administration. 49 C.F.R. § 1.50(f).

**4.** Plaintiffs in the FAC include the following automobile dealerships located in Modesto, Turlock, Merced, Madera, Lemoore, Tulare, and Porterville: Central Valley Chrysler–Jeep, Inc.; Kitahara Pontiac GMC Buick, Inc.; Madera Ford Mercury, Inc.; Madera Chevrolet;

CARB's executive director, to prevent enforcement of the California regulations.[5] In their first amended complaint ("FAC"), filed February 16, 2005, Plaintiffs seek declaratory and injunctive relief on the following claims:

1. Count I—Preemption under the Energy Policy and Conservation Act of 1975 ("EPCA"), 49 U.S.C. §§ 32902–32919.

Count II—Preemption under § 209(a) of the Federal Clean Air Act, 42 U.S.C. § 7543(a).

Count III—Preemption under the foreign policy of the United States and the foreign affairs powers of the Federal Government.

Count IV—Violation of the Dormant Commerce Clause of the United States Constitution.

Count V—Violation of the Sherman Act, 15 U.S.C. § 1.

On June 1, 2006, Defendant and Defendant–Intervenors jointly filed a motion for judgment on the pleadings contending that each of Plaintiffs' and Plaintiff–Intervenor's causes of action had failed to state a claim upon which relief can be granted.[6] On July 24, 2006, Plaintiffs filed a memorandum in opposition to the motion. On the same day, Plaintiff–Intervenor filed a separate memorandum, also opposing the motion. On August 17, 2006, Defendant and Defendant–Intervenors filed a reply to the opposition. On September 7, 2006, Plaintiffs filed an ex parte motion for leave to file a surreply brief, to which Defendants objected. On September 11, 2006, the court granted Plaintiffs' ex parte motion. On September 15, 2006, the court heard the motion for judgment on the pleadings.

## LEGAL STANDARD

Where Rule 12(c) is used to raise the defense of failure to state a claim, "the motion for judgment on the pleadings faces the same test as a motion under Rule 12(b)(6)." *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir.1988). Dismissal of a complaint is proper if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When determining a motion for judgment on the pleadings, the court should assume the allegations in the complaint to be true and construe them in the light most favorable to the plaintiff. *McGlinchy,* 845 F.2d at 810. However, "conclusory allegations without more are insufficient to defeat a motion [for judgment on the pleadings]." *Id.* A complaint may be dismissed as a matter of law if there is a lack of a cognizable legal theory or if there are insufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). The court must deter-

Frontier Dodge, Inc.; Tom Fields Motors, Inc.; Pistoresi Chrysler Dodge Jeep; Bob Williams Chevrolet; Courtesy Oldsmobile Cadillac, Inc.; Merle Stone Chevrolet, Inc.; Merle Stone Porterville, Inc.; Sturgeon and Beck Incorporated; and Swanson Fahrney Ford, Inc. General Motors Corporation, DaimlerChrysler Corporation, the Tulare County Farm Bureau, and the Alliance of Automobile Manufacturers are also plaintiffs. The Association of International Automobile Manufacturers ("AIAM" or "Plaintiff–Intervenor") has intervened as a plaintiff.

5. Sierra Club, Bluewater Network, Global Exchange, Rainforest Action Network, and Natural Resources Defense Council have intervened as defendants.

6. States that have adopted California's emission standards, along with the City of New York, have collectively filed briefs as amici arguing in favor of judgment on the pleadings. The amici are the States of New York, Connecticut, Maine, New Jersey, Oregon, Rhode Island, Vermont, Washington, the Commonwealth of Massachusetts, and the City of New York.

mine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of a plaintiff's claims. *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir.1978), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979).

## DISCUSSION

### A. EPCA Preemption

Plaintiffs and Plaintiff–Intervenor [7] (collectively "Plaintiffs") allege that the EPCA preempts the California regulations. They contend that the California regulations are expressly preempted because they are "related to fuel economy standards" under 49 U.S.C. § 32919(a). Plaintiffs also urge the court to find that the EPCA preempts the entire field of fuel economy regulations and that the California regulations are invalid because they fall within that field. Because Plaintiffs have stated a claim for preemption of the regulations based on their actual conflict with the EPCA, the court declines to decide at this stage whether the other theories of preemption have merit.

The Supremacy Clause, U.S. Const., art. VI, cl. 2, "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712–13, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824) (Marshall, C. J.)). Congress, when acting within its constitutional limits, may preempt state law by expressly stating its intent to do so. *Id.* at 713 (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). In the

absence of such express language, a court can infer Congress's intent to preempt all state law in a particular area "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). "In addition to express or implied pre-emption, a state law also is invalid to the extent that it 'actually conflicts with a ... federal statute.' " *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491–92, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Such a conflict can result in preemption where it is impossible for a private party to comply with both the state and federal requirements. *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Conflict preemption can also be found where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Int'l Paper*, 479 U.S. at 491–92, 107 S.Ct. 805 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

In *Geier v. American Honda Motor Co.*, 529 U.S. 861, 874–86, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), the Supreme Court discussed the circumstances in which a more-restrictive state law "actually conflicts" with a federal regulatory scheme. That case concerned whether a state tort law attaching liability for an automobile manufacturer's failure to install an airbag conflicted with the regulatory scheme administered by the Department of Transportation ("DOT"). *Id.* at 874, 120 S.Ct. 1913. Based on its authority under the

---

**7.** AIAM's Complaint in Intervention alleges that the California regulations are preempted under both the EPCA and the Clean Air Act. Defendants do not provide any basis to grant judgment on the pleadings with respect to AIAM's claims distinct from its arguments for

dismissal of Counts I and II of the FAC. Accordingly, the court's analysis of EPCA and Clean Air Act preemption applies to both Plaintiffs' FAC and Plaintiff–Intervenor's Complaint in Intervention.

National Traffic and Motor Vehicle Safety Act of 1966, the DOT had issued a safety standard that did not require airbags in every vehicle, but instead mandated a mix of several different passive restraint systems, including airbags. *Id.* at 878, 120 S.Ct. 1913. The Court considered the DOT's reasons for imposing a variety of restraints, rather than requiring all vehicles to use airbags. *Id.* at 875, 120 S.Ct. 1913. DOT had considered, among other things, the potential safety risks of employing airbags, their high cost, and public reluctance to use them. *Id.* at 877–78, 120 S.Ct. 1913. DOT had concluded that an "all-airbag" standard would threaten a consumer backlash over perceived or real safety risks. *Id.* at 879, 120 S.Ct. 1913. On the other hand "a mix of devices would help develop data on comparative effectiveness, would allow the industry time to overcome the safety problems and the high production costs associated with airbags, and would facilitate the development of alternative, cheaper, and safer passive restraint systems" while avoiding the backlash. *Id.* The safety standard also provided for the gradual phase-in of passive restraints to allow the manufacturers more time to develop airbags and other devices and to develop information about the effectiveness of various systems. *Id.* The Court held that the state law, though it shared some of the federal standard's goals, nevertheless presented an obstacle to the accomplishment the federal objec-

tives and was preempted. *Id.* at 885, 120 S.Ct. 1913; *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 107, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (holding that, regardless of the state statute's purposes, it is preempted if it "sufficiently interferes with federal regulation").

■ Plaintiffs contend that the California regulations stand as an obstacle to the accomplishment of the objectives of the EPCA. Under the EPCA, NHTSA sets CAFE standards at the "maximum feasible level" after considering various statutory factors. 49 U.S.C. §§ 32902(a), 32902(c); *see* 49 U.S.C. § 32902(f). The factors Congress requires NHTSA to consider provide insight into the objectives of the CAFE program. NHTSA must consider "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C. § 32902(f). In setting its maximum feasible level, NHTSA must also consider the effect of fuel economy requirements on safety. *Competitive Enter. Inst. v. NHTSA,* 956 F.2d 321, 327 (D.C.Cir.1992).

The court finds that it is also appropriate to "place some weight" upon NHTSA's interpretation of the EPCA's objectives. *See Geier,* 529 U.S. at 883, 120 S.Ct. 1913. This is because NHTSA "is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements."[8] *Id.* According to

---

**8.** At oral argument, Defendants pointed out that the Supreme Court in *Geier* acknowledged that it would have reached the same result "even without giving DOT's own view special weight," making the language endorsing consideration of the agency's view of its goals dicta. 529 U.S. at 886, 120 S.Ct. 1913. The Ninth Circuit has nevertheless cited *Geier* for the proposition that preemption can turn on an agency's opinion. *See Oxygenated Fuels Ass'n v. Davis,* 331 F.3d 665, 672 (9th Cir.2003) (holding that *Geier* was distinguishable and preemption was inappropriate be-

cause, among other reasons, EPA had not interpreted its governing statute to preempt the state regulation). In any event, the Supreme Court's rationale for considering the agency's view of its goals and the effect of a state statute is convincing. The court therefore gives weight to these opinions of NHTSA without ceding its duty to decide the issue of preemption de novo. *See Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 744, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996); *Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.,* 200 F.3d 590, 592 (9th Cir.2000).

NHTSA, one of the goals of the CAFE program is "improving motor vehicle fuel economy." Average Fuel Economy Standards for Light Trucks Model Years 2008–2011, 71 Fed.Reg. 17,566, 17,667 (April 6, 2006) (to be codified at 49 C.F.R. pts. 523–33, 537). To do so, NHTSA must set fuel economy at the "maximum feasible level" while "avoiding serious adverse economic effects on manufacturers and maintaining a reasonable amount of consumer choice among a broad variety of vehicles." *Id.* Accordingly, Congress "carefully drafted" the CAFE program to require fuel economy restrictions "that do not have the effect of either 'imposing impossible burdens or unduly limiting consumer choice as to capacity and performance of motor vehicles.'" *Id.* (quoting H. Rep. No. 94–340, at 87 (1975).)

Based on the language of the EPCA and NHTSA's statements, the court finds that among the objectives of the CAFE program are maximizing fuel economy, avoiding economic harm to the automobile industry, maintaining consumer choice, and ensuring vehicle safety. Plaintiffs' FAC alleges that the enforcement of the California regulations will have a damaging impact on the objectives of CAFE. The FAC alleges that some manufacturers will need to improve the average fuel economy level for some of their passenger automobiles to 44 miles per gallon, whereas the current federal standard requires an average of only 27.5 miles per gallon. FAC ¶ 78. The California regulations require a fuel economy standard "approaching" 27 miles per gallon for certain vehicles that must only meet the "light duty truck" standard of 22.2 miles per gallon under the federal scheme. FAC ¶ 79. Plaintiffs allege in the FAC that the regulations, by requiring motor vehicles to attain substantially higher fuel economy, will result in higher retail prices to the consumer and higher costs and burdens on the industry. FAC ¶ 77. As a result, the regulations allegedly "will

have an acute, clear, direct and substantial impact [on] the performance, price, and availability of vehicles that will be sold in California" and "on some manufacturers' activities to comply with the national fuel economy standards as efficiently and safely as possible, and in a manner that maximizes consumer choices and minimizes adverse effects on employment." *Id.*

The FAC alleges that vehicle manufacturers are currently designing their vehicles for model year 2009. FAC ¶ 81. According to the FAC, the technologies and vehicle changes the automobile industry is currently developing cannot fully comply with the California regulations. FAC ¶ 86. The FAC alleges that enforcement of the California regulations will force them to (1) face sanctions for noncompliance in model year 2009, (2) incur increased cost by redesigning vehicles already slated for production in model year 2009, making the sale of vehicles unprofitable in many instances, or (3) restrict the sale of the vehicles that threaten compliance, foregoing the opportunity to recover investment and production costs and profits they anticipated for those vehicles. FAC ¶ 81. Plaintiffs allege that, if a manufacturer chooses to redirect its engineers and developers to redesign vehicles for California, it will sacrifice its efforts to introduce new products in markets other than California, resulting in lost sales for manufacturers and lost goodwill and profits for dealers. FAC ¶ 82. The FAC also alleges that some manufacturers will have to spend hundreds of millions of dollars to develop model year 2009 vehicles that comply. FAC ¶ 101(c). These expenditures will allegedly result in price increases with the effect of reducing sales and goodwill for the manufacturers and the dealers. *Id.* The FAC alleges that the California regulations will also cause manufacturers to restrict or eliminate the sale of some types of vehicles in California. FAC ¶ 84. As a result, Plaintiffs contend,

consumers will turn to the used-vehicle market or will select vehicles less suited to their needs or business demands. *Id.*

The FAC also alleges that enforcement of the California regulations will result in less safe automobiles and increased vehicle-related fatalities. FAC ¶¶ 87–92. According to the FAC, the regulations, once fully implemented, will "likely require the industry to produce a fleet of smaller, lighter-weight vehicles for California." FAC ¶ 90. The FAC cites a report to Congress concluding that a decrease in vehicle size, "without a concurrent upgrading of their occupant protection capability, would likely lead to an increase in the rate of highway deaths and serious injuries." FAC ¶ 88. Plaintiffs allege that, according to an analysis using NHTSA's predictive model, the California regulation will result in an increase of 258 fatalities in California in 2020, and an increase of 530 fatalities in 2030. FAC ¶ 91.

Along with NHTSA's evaluation of CAFE's objectives, the court also considers its opinion that the California regulations would disrupt the achievement of those objectives. *See Geier*, 529 U.S. at 883, 120 S.Ct. 1913. NHTSA concludes that a state carbon dioxide emission standard requiring better fuel economy than the CAFE level "would upset the efforts of NHTSA to balance and achieve Congress's competing goals." Standards for Light Trucks, 71 Fed.Reg. at 17,667. A state standard set above that determined by NHTSA under the statutory guidelines "would negate the agency's analysis and decisionmaking" that it arrives at "only after considering extensive technical information such as detailed product information submitted by the vehicle manufacturers and NAS' report on the future of the

CAFE program and conducting analyses of potential impacts on employment and safety." *Id.* at 17,667–68. Accordingly,

> NHTSA concludes that it is disruptive to the orderly implementation of the CAFE program, and to NHTSA's reasonable balancing of competing concerns, to have two different governmental entities assessing the need to conserve energy, technological feasibility, economic practicability, employment, vehicle safety and other concerns, and making inconsistent judgments made [sic] about how quickly and how much of that single pool of technology could and should be required to be installed consistent with those concerns.

*Id.* at 17,668. Thus, NHTSA has decided, echoing Plaintiffs' factual allegations, that such conflicting standards risk "serious adverse economic consequences for motor vehicle manufacturers and unduly limited choices for consumers." *Id.*

On a motion for judgement on the pleadings, the court accepts as true Plaintiffs' factual allegations about the effects of the California regulations. *McGlinchy*, 845 F.2d at 810. Defendants do not contend that Plaintiffs have failed to adequately allege facts supporting their claims that California regulations will risk higher prices, decreased choices and safety for the consumer, and decreased profitability and lost goodwill for manufacturers and dealers.[9] Defendants instead contend that Congress intended to permit the California regulations regardless of such impacts.

Defendants argue that California's regulations are permissible because the EPCA requires NHTSA to take such regulations into account in setting the CAFE level. The EPCA provides that NHTSA, "[w]hen

9. In their reply brief, Defendants contend that the California regulations are consistent with the EPCA's "primary purpose": improving fuel economy. Defs.' Reply 17 n. 3. They do not dispute, however, that maximizing safety, consumer choice, and the economic well-being of the automobile industry are also among the EPCA's goals.

deciding maximum feasible average fuel economy ... shall consider ... the effect of other motor vehicle standards of the Government on fuel economy...." 49 U.S.C. § 32902(f). Defendants point out that the phrase "other motor vehicle standards" encompasses "California standards approved by EPA under section 209(b)." Reply 9:18–19; *see* EPCA § 301, 89 Stat. at 905. Defendants clarify the proposition, stating that the "NHTSA is not required to consider California's standards unless EPA, another federal agency, has approved them." Reply 14:27–28. Defendants further allege that the Clean Air Act requires the EPA, when deciding whether to grant a waiver, to make determinations similar to those on which CAFE is based.[10] Plaintiffs do not dispute that, under section 32902(f), NHTSA must consider regulations that receive a waiver under 209(b).

Defendants argue that when Congress adopted the EPCA in 1975, it knew that motor vehicle emission standards affect fuel economy. *See* H.R.Rep. No. 94–340, at 86–87, 90–91 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1762, 1848–49, 1852–53. Certain California emission standards then in place decreased average fuel economy. *Id.* at 87. The EPCA permitted manufacturers to apply for a relaxation of the average fuel economy standard if the federal standards, including those California standards granted a waiver under section 209(b), resulted in lower fuel economy. EPCA § 301, 89 Stat. at 904–05; H.R.Rep. No. 94–340, at 90–91; *see Center for Auto Safety v. NHTSA,* 793 F.2d 1322, 1325 & n. 12 (D.C.Cir.1986). Defendants contend that Congress integrated section 209 stan-

dards into the EPCA by requiring NHTSA to account for "other motor vehicle standards of the Government on fuel economy...." 49 U.S.C. § 32902(f).

Defendants argue that state law does not stand as an obstacle to a federal statute when the federal government "contemplates coexistence between" the two regulatory schemes, citing *Skysign International v. City & County of Honolulu,* 276 F.3d 1109, 1117 (9th Cir.2002). In *Skysign,* the Ninth Circuit considered whether a municipal ordinance barring aerial advertising was preempted by the FAA regulatory scheme. *Id.* at 1113. After deciding that FAA regulation did not preempt the field of aerial advertising, the court addressed whether conflict preemption barred the ordinance. *Id.* at 1117. At the outset, the court noted that, in a conflict preemption analysis, "state law cannot ***by its mere existence*** stand as such an obstacle when the federal government contemplates coexistence between federal and local regulatory schemes." *Id.* (emphasis added). The court was careful to qualify that the federal government, by merely authorizing the states to act, did not immunize state regulations from conflict preemption scrutiny: "Of course, even when the federal government has evinced its intent to leave the states and localities some room in which to regulate, some local regulation may transgress those boundaries by interfering with the underlying federal purposes." *Id.* at 1118 n. 5. The court noted that the FAA had granted permission for the aerial advertisement with the explicit instruction that

---

**10.** Plaintiffs construed this line of argument as a contention that the EPA would only grant a waiver if it decided that the EPCA did not preempt the regulations and filed a surreply brief refuting that argument. *See* Pls.' Ex Parte Mot. for Leave to File Surreply 1:7–12. Defendants disclaim making any contention that the EPA would consider whether the

EPCA preempted the California regulations or consider whether the regulations affect the "goals and purposes" of the EPCA. Defs.' Objection to Pls.' Surreply Brief 3:12–18. Defendants concede that the EPA's review of the regulations is limited by the criteria in section 209(b). *Id.* at 3:18–20.

the advertiser abide by local laws and ordinances related to aerial signs. *Id.* at 1117–18. The FAA had also made explicit statements in public documents that its grant of permission did not supercede any "local, state, or city ordinance(s) prohibiting aerial advertising." *Id.* at 1118. Given the FAA's explicit deference to local ordinances prohibiting aerial advertising, the court concluded that the ordinance at issue did not "impede the federal policy or purpose" of the FAA permission scheme. *Id.*

Defendants' reliance on *Skysign* is misplaced. It does not stand for the proposition that state law does not stand as an obstacle whenever the federal government contemplates the coexistence between federal and state regulatory schemes. *See id.* at 1117–18 & n. 5. The holding is much more circumscribed, requiring courts to look beyond the mere fact that federal and state regulations coexist and to analyze the extent the state law "interfer[es] with the underlying federal purposes." *Id.* at 1118 n. 5. Here, unlike in *Skysign*, NHTSA has not expressly or impliedly claimed that the California regulations are permissible or can be harmonized with the EPCA scheme. Instead NHTSA has explicitly found that the challenged regulations would disrupt the CAFE program. *See* Standards for Light Trucks, 71 Fed.Reg. at 17,668.

Defendants also cite in support *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 126, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973). The Court in that case emphasized the value of protecting "the sensitive interrelationship" between federal and state regulation of securities. *Id.* at 126–27, 94 S.Ct. 383. Nevertheless, the Court held that conflicting state law

was preempted "to the extent necessary to protect the achievement of the aims" of the federal regulatory scheme.[11] *Id.* at 127, 94 S.Ct. 383.

Neither *Skysign* or *Merrill Lynch* stands for the proposition that congressional authorization of a state regulation immunizes it from a conflict preemption challenge. Rather, each requires an analysis of whether the state regulation, even if authorized, is an obstacle to the objectives of the federal scheme. *Skysign,* 276 F.3d at 1118 n. 5; *Merrill Lynch,* 414 U.S. at 127, 94 S.Ct. 383.

Defendants contend that the EPCA and regulations that receive an EPA waiver under section 209(b) comprise "an overlapping federal scheme." Defs.' Reply 14:27–15:3. They point out that the EPA under the Clean Air Act, like NHTSA pursuant to the EPCA, considers the technological feasibility and economic practicability of emission standards. Defendants note that the EPA, when scheduling implementation of regulations that have received a waiver, allows such a regulation to take effect only "after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." 42 U.S.C. § 7521(a)(2).

Nothing in the statutory language or the legislative history of the Clean Air Act, the EPCA, or any other statute before the court indicates Congress's intent that an EPA waiver would allow a California regulation to disrupt the CAFE program. Section 209(b) provides only that the waiver exempts the regulations from express preemption under section 209(a). *See* 42

---

11. *Merrill Lynch* appears to suggest that when possible, the state statute should be preempted only to the extent that it stands as an obstacle to the federal schemes goals. 414

U.S. at 127, 94 S.Ct. 383. Defendants do not argue that some severable portion of the California regulations does not impede achieving the EPCA's goals.

U.S.C. § 7543(b)(1). ("The Administrator shall, after notice and opportunity for public hearing, waive application of *this section* . . . ." (emphasis added)). On its face, the language does not endorse regulations that present obstacles to the objectives of the EPCA, nor do the criteria considered by EPA in granting a waiver ensure that such interference will not occur.

Section 209(b) does not provide that the regulations, once EPA grants a waiver, become federal law and are thereby rendered immune from preemption by other federal statutes. Defendants point out that compliance with state standards that have been granted a waiver is treated as compliance with federal standards, giving them federal status. 42 U.S.C. § 7543(b)(3). However, the sentence to which Defendants refer indicates that "compliance with such State standards shall be treated as compliance with applicable Federal standards *for purposes of this subchapter.*" *Id.* (emphasis added). Section 177 demonstrates that Congress also gave narrow effect to other states' adoption of regulations that receive a waiver. *See* 42 U.S.C. § 7507 (providing that "*[n]otwithstanding section 7543(a) of this title,*" the Clean Air Act's express preemption provision, other states may adopt standards identical to California's (emphasis added)). Hence, the statutory language explicitly disclaims any special status for the California regulations under other federal statutes. The legislative history generally emphasizing the breadth of California's discretion upon receiving an EPA waiver does not provide any reason to believe that the resulting regulations could stand as an obstacle to other federal schemes. *See, e.g.,* H.R.Rep. No. 95–294, at 301–02 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1380–81.

The language of the EPCA also does not evince an intent to permit state regulations that conflict with the goals of its scheme. The requirement that the Secretary "shall consider" the effect of the California regulations does not indicate congressional intent to permit regulations that are obstacles to the EPCA's goals, such as ensuring vehicle safety, the economic health of the industry, and consumer choice. *See* 49 U.S.C. § 32902(f). The parties do not discuss in depth the effect of the term "consider" in the language of section 32902(f). Defendants appear to read into this language a mandate that the EPCA accommodate other regulations, including those granted an EPA waiver. *See also* Defs.' Mot. 21:16–17 (asserting that "Congress has required that NHTSA *respect* California emission standards when establishing fuel economy standards" (emphasis added)). At oral argument, Defendants contended that requiring NHTSA to consider the California regulations made them "part of EPCA." Defendants urge that the requirement that NHTSA consider the California regulations amounts to Congressional authorization of such regulation, regardless of their effects on the EPCA's goals.

However, a congressional requirement that a decision maker "consider" a factor does not deserve the weight than Defendants place on it. Congress's use of the term "consider" in a statute requires an actor to merely "investigate and analyze" the specified factor, but not necessarily act upon it. *City of Davis v. Coleman,* 521 F.2d 661, 679 (9th Cir.1975); *J.H. Miles & Co., Inc. v. Brown,* 910 F.Supp. 1138, 1156 (E.D.Va.1995) (regulation requiring federal fishing officials to "consider" a statutory factor in setting fishing quota recommendations was not a "strict dictate" and suggested officials had "some discretion" in preparing their recommendation); *T.S. v. Ridgefield Bd. of Educ.,* 808 F.Supp. 926, 931 (D.Conn.1992) (requirement under Individuals with Disabilities Education Act ("IDEA") that an independent educational evaluation "must be considered" was met

where an individual who reviewed the evaluation read an summarized portions at a school meeting); *G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 947 (1st Cir.1991) (report "considered" under IDEA where it was reviewed at a meeting). The language of section 32902(f) merely requires NHTSA to investigate and analyze what effect the "other" regulations will have on fuel economy.

These definitions of "consider" comport with NHTSA's interpretation of section 32902(f). Responding to suggestions that the provision prevents preemption, NHTSA concluded that the "EPCA's decisionmaking factor provision is neither a saving clause nor a waiver provision.... The agency interprets that provision only to direct NHTSA to consider those State standards that can otherwise be validly adopted and enforced under State and Federal law." Standards for Light Trucks, 71 Fed.Reg. at 17,669. After having investigated and analyzed all of the required factors, the agency is free to set the maximum feasible average fuel economy based on all of the information properly before it. Even if one objective of EPCA is to set fuel economy standards in a manner that takes into account the effects of California standards receiving a waiver, this does not evince Congress's intent that such a standard is permitted to impair the achievement of the EPCA's other objectives. *See Geier*, 529 U.S. at 885, 120 S.Ct. 1913. The court sees no reason to interpret Congress's directive as to which information NHTSA must consider as permission for a state law to disrupt the objectives of the EPCA. Nor do Defendants cite any legislative history that furthers its reading of the "shall consider" language of section 32902(f).

Because nothing before the court evinces Congress's intent to permit California regulations that stand as an obstacle to the EPCA's objectives, Plaintiffs have stated a claim for EPCA preemption and the court will not grant judgment on the pleadings on this cause of action.

**B. Clean Air Act Preemption**

Plaintiffs contend that the California regulations are preempted by section 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a). Section 209(a) provides that a state may not "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." *Id.* Meanwhile, section 209(b) provides a means for the EPA to waive the prohibition under section 209(a) provided it makes certain findings. 42 U.S.C. § 7543(b).

 Defendants do not contend that, under section 209(a), the challenged regulations are not a "standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a). Accordingly, the regulations are preempted unless the EPA issues a waiver under section 209(b). 42 U.S.C. § 7543(b). Defendants ask the court to enter judgment on the pleadings in their favor on this claim on the basis that "Plaintiffs and Plaintiff-intervenor have virtually abandoned their principal Clean Air Act claim." Defs.' Reply 4:4–5. Defendants point out that Plaintiffs have not challenged their contentions that the Clean Air Act authorizes the regulation of greenhouse gas emissions as pollutants or that the EPA has the authority to issue California a waiver. Accepting these arguments, however, does not mean that the regulations are subject to a waiver under section 209(b).[12] The EPA can still deny a

---

**12.** In the alternative, Defendants ask the court to enter judgment against Plaintiffs' contention that the "EPA may not issue a waiver under section 209(b)(1)(C)." Defs.' Reply 4:11–13. At oral argument, Defendants proposed that the court also decide at this stage that EPA's authority extends regulation of greenhouse gases. Defendants urge that

waiver on the basis of a factual finding that the regulations are not needed to meet "compelling and extraordinary conditions." [13] 42 U.S.C. § 7543(b)(1)(B).

In any event, the EPA has not waived 209(a) preemption with respect to the California regulations. Nothing in the Plaintiffs' FAC, the Plaintiff-intervenor's complaint, or in any other part of the record justifies granting judgment on the pleadings by speculating that the EPA will make a future factual finding that favors Defendants, the moving parties. Thus, Defendants' motion for judgment on the pleadings on this cause of action must be denied.

## C. Conflict with United States Foreign Policy

■ It is beyond dispute that "at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). After all, it was out of "concern for uniformity in this country's dealings with foreign nations" that the Constitution allocated the foreign relations power to the federal government. *Id.* (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427, n. 25, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)). The "executive power" vested in Article II of the Constitution provides the President the "vast share of responsi-

bility for the conduct of our foreign relations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring). "While Congress holds express authority to regulate public and private dealings with other nations in its war and foreign commerce powers, in foreign affairs the President has a degree of independent authority to act." *Garamendi*, 539 U.S. at 414, 123 S.Ct. 2374.

In *Garamendi*, the Supreme Court addressed whether California's Holocaust Victim Insurance Relief Act of 1999 ("HVIRA") was preempted because it interfered with the federal government's conduct of foreign relations. *Id.* at 401, 123 S.Ct. 2374. HVIRA required insurers doing business in California to disclose details of any insurance policies issued in Europe between 1920 and 1945, which would be made public through a central registry. *Id.* at 409–10, 123 S.Ct. 2374. Around the time that the legislation was passed, President Clinton was attempting to negotiate with the German government to develop a coordinated approach to these claims. *Id.* at 405, 123 S.Ct. 2374. In 2000, President Clinton and German Chancellor Schroder signed the German Foundation Agreement, in which Germany agreed to enact legislation establishing a foundation funded by the German government and German industry to compensate those injured by German companies during the Nazi era.

---

such holdings are proper under the rule that a motion to dismiss "may be granted as to part of a complaint and denied as to the remainder." *See Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982) (affirming the dismissal of certain claims against defendants and reversing the district court's dismissal of other claims). Here, the court has concluded Plaintiffs have stated a claim for preemption under the Clean Air Act, regardless of whether the EPA has the power to issue a waiver authorizing the California regulations. Accordingly, the court declines at

this stage to decide the scope of the EPA's power.

13. AIAM's complaint explicitly alleges that no factual basis exists for such a finding. AIAM Compl. ¶ 62. As Judge Coyle decided in his order of October 21, 2005, the issue before the court on the Clean Air Act claim is whether section 209(a) preemption applies, not whether the EPA will deem a waiver of the California regulations appropriate under section 209(b) criteria, such as whether "compelling and extraordinary conditions" justify the regulations.

*Id.* In exchange, the President promised to attempt to shield Germany from litigation by filing Statements of Interest in the courts, encouraging judges to defer to Foundation procedure. *Id.* at 406, 123 S.Ct. 2374. Both nations also agreed that the Foundation would work with the International Commission on Holocaust Era Insurance Claims to establish procedures for handling claims. *Id.* at 407, 123 S.Ct. 2374.

The *Garamendi* Court, in determining whether HVIRA was preempted under the foreign affairs doctrine, considered its analysis of an Oregon probate statue in *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968). The statute in *Zschernig* "prohibited inheritance by a nonresident alien, absent showings that the foreign heir would take the property 'without confiscation' by his home country and that American citizens would enjoy reciprocal rights of inheritance there." *Id.* at 417, 88 S.Ct. 664. In practice, the statute encouraged state judges in Oregon probate proceedings to disparage foreign governments and express anticommunist views. *Id.* Accordingly, the majority struck down the statute because it "impair[ed] the effective exercise of the Nation's foreign policy." *Id.* at 440, 88 S.Ct. 664. The majority concluded that the statute had "a direct impact upon foreign relations" and potentially would "adversely affect the power of the central government to deal with those problems." *Id.* at 441, 88 S.Ct. 664. In a concurring opinion, Justice Harlan interpreted past Supreme Court jurisprudence as establishing that "in the absence of a conflicting federal policy or violation of the express mandates of the Constitution the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations." *Id.* at 458–59, 88 S.Ct. 664 (Harlan, J., concurring).

In *Garamendi,* the Court decided that the majority's and Justice Harlan's opinions in *Zschernig* represented "contrasting theories of field and conflict preemption." *Garamendi,* 539 U.S. at 419, 123 S.Ct. 2374. The Court declined to decide which approach is correct. *Id.* at 419–20, 123 S.Ct. 2374. Instead, the Court found that HVIRA was preempted under either approach because it would "produce something more than incidental effect in conflict with express foreign policy of the National Government." *Id.* at 420, 123 S.Ct. 2374. In deciding the propriety of state legislation in an areas of "their traditional competence," the Court noted that under Justice Harlan's view it is reasonable to "consider the strength of the state interest, judged by standards of traditional practice." [14] *Id.*

■ The parties dispute the current administration's approach to reductions of greenhouse gas emissions. Plaintiffs focus on language in an EPA report describing the current administration's greenhouse gas emissions strategy:

> Unilateral EPA regulation of motor vehicle GHG emissions could also weaken U.S. efforts to persuade key developing countries to reduce the GHG intensity of their economies.

---

**14.** The Court also suggested, but did not adopt, a complementary application of Justice Harlan's and the *Zschernig* majority's approach. *Garamendi,* 539 U.S. at 419 n. 11, 123 S.Ct. 2374. Such an approach would call for field preemption when the state legislation addressed a matter that was not a "traditional state responsibility." *Id.* On the other hand, a court should strike down legislation within the state's "traditional competence" only upon a finding of a conflict with foreign affairs of sufficient "clarity or substantiality" based on "the strength or the traditional importance of the state concern asserted." *Id.*

Considering the large populations and growing economies of some developing countries, increases in their GHG emissions could quickly overwhelm the effects of GHG reduction measures in developed countries. Any potential benefit of EPA regulation could be lost to the extent other nations decided to let their emissions significantly increase in view of U.S. emission reductions. Unavoidably, climate change raises important foreign policy issues, and it is the President's prerogative to address them. Control of Emissions, 68 Fed.Reg. at 52,-931 (footnote omitted).[15] The report goes on to conclude that "the President's policy emphasizes international cooperation and promotes working with other nations to develop an efficient and coordinated response to global climate change." *Id.* at 52,933. Plaintiffs allege that the implementation of the California regulations "interferes with the ability of the United States to speak with one voice upon matters of global climate change" and "diminishes the bargaining power of the United States in negotiating multilateral reductions of greenhouse gases." FAC ¶ 130.

▮ Plaintiffs also cite the opinion of a district court dismissing claims seeking to abate greenhouse gas emissions on a public nuisance theory as nonjusticiable political questions. *See State of Connecticut v. Am. Elec. Power Co.*, 406 F.Supp.2d 265 (S.D.N.Y.2005). In determining the Executive Branch's current approach to greenhouse gas reduction, the court considered the reluctance of Congress and the Executive Branch to impose formal limits on such emissions. *Id.* at 269–70. It noted that Congress has focused its efforts toward researching the effect of emissions, for instance, through the National Climate Program Act of 1978, 15 U.S.C. § 2901 *et seq.,* and the Global Change Research Act, 15 U.S.C. §§ 2931–2938. *Id.* at 269. The court also mentioned that President H.W. Bush had signed, and the senate ratified, the United Nations Framework Convention on Climate Change ("UNFCCC"), "which brought together a coalition of countries to work toward a coordinated approach to address the international issue of global warming." *Id.* UNFCCC member nations, and President Clinton, signed the Kyoto Protocol, which called for mandatory reductions in greenhouse gas emissions. *Id.* The court recognized, however, that the Senate did not approve the Protocol, rather voting 95–0 in the so-called Byrd–Hagel resolution to "urge the President not to sign any agreement that would result in serious harm to the economy or that did not include provisions regarding the emissions of developing nations." *Id.* (citing S. 98, 105th Cong. (1997)). Congress subsequently passed legislation barring the EPA from implementing the protocol. *Id.* (citing Pub.L. No. 105–276, 112 Stat. 2461, 2496 (1998); Pub.L. No. 106–74, 113 Stat. 1047, 1080 (1999); Pub.L. No. 106–377, 114 Stat. 1441, 1441A–41 (2000)). The court then considered President George W. Bush's opposition to the Protocol based on its exemption of developing nations, its failure to address two major pollutants, and its negative impact on the United States. *Id.* The court concluded by citing the EPA report's focus on "international cooperation" and "coordinated response" as an expression of "the policy of the current administration." *Id.* at 270

---

**15.** Defendants contend that, if the Supreme Court ultimately decides that the EPA may not consider the effect of a state regulation on foreign affairs when it grants a waiver, then Plaintiffs foreign policy preemption claim fails. Regardless of the Supreme Court's ultimate holding on this issue, the statement remains an expression by an executive agency of the President's foreign policy strategy.

(citing Control of Emissions, 68 Fed.Reg. at 52,933).

The recent cases in which the Supreme Court has held that a state statute is preempted based on United States foreign affairs concern an executive agreement or federal statute with which the state legislation conflicts. *See Garamendi*, 539 U.S. at 421, 123 S.Ct. 2374 (focusing preemption inquiry on "the national position, expressed unmistakably in the executive agreements signed by the President"); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–76, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (considering whether the challenged state law "might . . . blunt the consequences" of actions available to the President pursuant to a federal statute). Here, Plaintiffs do not contend that the United States' opposition to unilateral greenhouse gas emission or its pursuit of negotiated reductions is embodied in any particular executive agreement or federal statute. Rather, Plaintiffs point to Executive Branch statements, the absence of national greenhouse gas regulations, and the Senate's rejection of binding emissions reductions in the Byrd–Hagel resolution to establish the nature of present United States policy.

Plaintiffs contend that the Byrd–Hagel resolution amounts to "implied authorization" of the administration's position on negotiating emissions reductions under *Youngstown*, 343 U.S. at 635, 72 S.Ct. 863. In *Youngstown*, the Court held that "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* Plaintiffs point out that recent Supreme Court authority provides that the scope of the President's power under *Youngstown* determines the scope of foreign policy preemption. *See Garamendi*,

539 U.S. at 414, 123 S.Ct. 2374; *Crosby*, 530 U.S. at 375, 120 S.Ct. 2288.

The Byrd–Hagel resolution expressed the Senate's opposition to any protocol to or other agreement regarding the UNFCCC that would:

> (A) mandate new commitments to limit or reduce greenhouse gas emissions for the Annex I Parties, unless the protocol or other agreement also mandates new specific scheduled commitments to limit or reduce greenhouse gas emissions for Developing Country Parties within the same compliance period, or
>
> (B) would result in serious harm to the economy of the United States; . . . .

S. 98, 105th Cong. (1997). While the resolution appears to speak as to what the sort of agreements the Senate refuses to support, it also appears to implicitly support a Presidential approach of negotiating reciprocal emissions reductions with other nations.

Defendants contend that the Byrd–Hagel resolution has been countermanded by a more recent one, the Bingaman–Domenici resolution, calling for binding limits "on emissions of greenhouse gases that slow, stop, and reverse the growth of such emissions" and that "will encourage comparable action by other nations." 151 Cong. Rec. S7033 (daily ed. June 22, 2005). While this later resolution expresses the Senate's sense that Congress should enact mandatory emissions limits, it does not contravene the Byrd–Hagel resolution's approach to international agreements. Moreover, the Bingaman–Domenici resolution does not speak to the President's authority to forge international agreements, as the Byrd–Hagel resolution did. The Senate's mere statement of its own intent to impose limits does not itself interfere with or express disapproval of the President's efforts to negotiate limits with other countries.

In any event, the Bingaman–Domenici resolution does not divest the President of his "independent authority to act" on matters of foreign affairs. *Garamendi,* 539 U.S. at 414, 123 S.Ct. 2374.

Even if the President lacks the Senate's endorsement of his negotiation-based approach to greenhouse gas emissions, he nonetheless can act pursuant to certain independent powers of his office. *See Youngstown,* 343 U.S. at 637, 72 S.Ct. 863. In *Garamendi,* the Supreme Court acknowledged that Presidential action pursuant to such "independent authority" in foreign affairs, such as making an executive agreement, could preempt interfering state laws. 539 U.S. at 414–15, 424 n. 14, 123 S.Ct. 2374 (noting that "the President in this case is acting without express congressional authority," but, because "the President possesses considerable independent constitutional authority to act on behalf of the United States on international issues, ... conflict with the exercise of that authority is a comparably good reason to find preemption of state law"). If the President were to negotiate with another nation or nations to agree to reduce greenhouse gas emissions, such an action would not be "incompatible" with the Senate's will as expressed in the Bingaman–Domenici resolution to obtain mandatory emissions reductions so as to place "his power is at its lowest ebb." *See Youngstown,* 343 U.S. at 637, 72 S.Ct. 863. Rather, an agreement to so reduce emissions would apparently further the Senate's expressed goals of ameliorating the risks associated with such emissions.

The Supreme Court cases do not suggest that the absence of a statute or an executive agreement is fatal to a foreign policy preemption claim. In fact, the Court's analysis suggests that such a claim is permissible. In *Garamendi,* though the Court addressed the preemptive effect of an executive agreement, it recognized a general "executive authority to decide what that policy should be" as well as authority to act independently of Congress. 539 U.S. at 414, 123 S.Ct. 2374. In the field of foreign policy, the President has the "lead role," which makes it appropriate to give weight to policy statements by Executive Branch officials to determine that policy. *Id.* at 422 & n. 12, 123 S.Ct. 2374 (considering statements of Executive Branch officials, in addition to executive agreements, to determine the nature of United States foreign policy). If Executive Branch statements are competent evidence of what our foreign policy is, the court sees no reason to limit preemption to foreign policy as expressed in statutes or executive agreements.

In *Crosby,* the Supreme Court has preempted state law based on its potential to interfere with future discretionary actions within the President's foreign policy power. 530 U.S. at 377, 120 S.Ct. 2288 (finding preemption where state statute "undermin[ing] the President's intended statutory authority by making it impossible for him to restrain fully the coercive power of the national economy when he may choose to take the discretionary action open to him"). In *Crosby,* even though the President's discretionary powers derived from a statute, the Court did not foreclose the potential preemption of a state statute interfering with a Presidential foreign policy option on which he has not yet acted. *Id.* Thus, so long as the President is empowered to act to benefit United States foreign policy interests, whether through express or implied congressional authorization or through his independent authority, a state statute that excessively interferes with an action "he may choose to take" in furtherance of that interest may be preempted. *See id.*

Defendants contend that the UNFCCC evidences a United States policy of unilat-

eral reductions of greenhouse gas emissions, contrary to the EPA's account of current policy. Defendants contend that signing on to the UNFCCC committed the United States to unilaterally decrease its greenhouse gas emissions:

> Each of these Parties shall adopt national policies and take corresponding measures on the mitigation of climate change, by limiting its anthropogenic emissions of greenhouse gases and protecting and enhancing its greenhouse gas sinks and reservoirs. These policies and measures will demonstrate that developed countries are taking the lead in modifying longer-term trends in anthropogenic emissions....

Defs.' RJN Ex. D at 12. Defendants point out that the UNFCCC signatories agreed to take the lead acknowledging that, as developed countries, they were responsible for the "largest share of historical and current" greenhouse gas emissions. *Id.* at 2. Defendants contend that the UNFCCC obligates the United States to refrain from activities that might damage the environment beyond its borders, to "protect the climate system," and to take precautions to "anticipate, prevent or minimize the causes of climate change and mitigate its adverse effects." Defs.' RJN Ex. D at 2, 9.

Defendants assert that the CAFE program under the EPCA belies Plaintiffs contention that United States policy is to eschew unilateral greenhouse gas regulation. In support, Defendants quote the allegation in the FAC that "[b]y setting fuel economy standards, the national government has regulated the level of greenhouse gases released by cars and trucks sold in this country." FAC ¶ 4. Plaintiffs respond that the CAFE program's fuel economy regulations only functionally regulate greenhouse gas emissions to achieve the ends specified in the EPCA, which was enacted before climate change became a significant issue. Plaintiffs distinguish the indirect carbon dioxide emission restrictions inherent in fuel economy from "more direct regulation" of greenhouse gases, which the administration has decided to undertake through multilateral agreements. Pls.' Opp'n at 63 n. 46. That the CAFE program affects carbon dioxide emissions does not contradict Plaintiffs contention that current Executive Branch policy is to negotiate carbon dioxide reductions with other nations. The CAFE program very well might constrain the sort of agreement that the President might make to the extent a proposed agreement was inconsistent with Congress's intent in enacting the EPCA. *See Youngstown,* 343 U.S. at 637, 72 S.Ct. 863. Nevertheless, a policy of seeking out such agreements is not logically or practically inconsistent with the CAFE program.

Defendants also cite statements by members of the State Department implying that the current administration does not intend to negotiate greenhouse gas limits with developing nations. Defendants provide a transcript of remarks of Dr. Harlan L. Watson, "Senior Climate Negotiator and Special Representative and Alternate Head of the U.S. Delegation, Montreal, Canada," on November 29, 2005. Defs.' RJN Ex. E. Defendants cite language from this document in support of their characterization of United States policy: "the United States is opposed to any such discussions under the Framework Convention.... We see no change in current conditions that would result in a negotiated agreement consistent with the U.S. approach.... We are not a party to the Kyoto Protocol and we do not support any such approach under the Convention for future commitments." Mot. 29:27–30:3 (citing Defs.' RJN Ex. E). Watson appears to only be discussing the United States' opposition to certain types of negotiations, specifically negotiations by the parties to the Kyoto Protocol targeted at

agreeing to a "second commitment period" beginning in 2013. Defs.' RJN Ex. E at 2. These remarks, therefore, are merely reiterating that the administration opposes binding limits modeled on the Kyoto approach, not that it opposes a negotiated strategy based on reciprocal greenhouse gas reductions.

Other parts of Watson's remarks leave open the possibility for negotiations outside of the Kyoto mold. Watson points out that currently, "through bilateral and U.S.-led multilateral partnerships with nearly all major developed and developing countries, we are leading a global approach to achieving our shared commitments to address climate change." *Id.* at 1. Dr. Watson goes on to state that the United States "need[s] to pursue our international efforts in a spirit of collaboration, not coercion, and with a true sense of partnership. This is especially true in our relations with developing nations, which have an imperative to grow their economies and provide for the welfare of their citizens." *Id.* at 2.

Defendants' position regarding United States foreign policy does not gain support from the press briefing of Dr. Paula Dobriansky, Under Secretary of State, on December 7, 2005. *See* Defs.' RJN Ex. F. She expresses the same skepticism as Watson about the potential for success of formalized discussions under the "Canadian proposal." *Id.* at 2. Dobriansky, speaking of the use of bilateral and multilateral partnerships to achieve climate change, stated that "the best way forward is through different and diversified approaches that leverage these critical partnerships." *Id.* at 1. Dobriansky does not enunciate a United States policy of shunning negotiations with developing nations regarding greenhouse gas emissions.

Defendants argue that, even if the California regulations interfere with the administration's policy to pursue international agreements regarding greenhouse gas emissions, they cannot be preempted in light of that policy because they have been authorized by Congress. In support, Defendants cite a case concerning California tax laws that were allegedly harmful to United States foreign policy goals. *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994). The California tax law called for a "worldwide combined reporting" method for certain multinational enterprises. *Id.* at 302, 114 S.Ct. 2268. For three decades, Congress had been aware that foreign governments were displeased with such requirements. *Id.* at 324, 114 S.Ct. 2268. On many occasions, Congress had studied state taxation of multinational enterprises and introduced numerous bills on the subject. *Id.* at 324–25, 114 S.Ct. 2268. On each occasion, Congress declined to bar the worldwide combined reporting approach. *Id.* at 325, 114 S.Ct. 2268. The Court concluded that Congress "implicitly has permitted the States to use the worldwide combined reporting method." *Id.* at 326, 114 S.Ct. 2268.

Defendants contend that here Congress has explicitly granted California the power to implement emissions regulations under section 209 of the Clean Air Act, providing an even stronger case against preemption than the implicit permission the Supreme Court found in *Barclays*. Defendants are hard-pressed, however, to show that section 209 demonstrates Congress's intent to permit California to implement emissions regulations even if they interfere with foreign policy goals. Defendants do not contend that, as was the case in *Barclays*, Congress has known for decades that California would impose carbon dioxide regulations that potentially interfere with international greenhouse gas negotiations and has declined opportunities to foreclose that approach. Presumably, Congress would not be required to draft section 209 so as to explicitly preclude emissions regulations

that interfere with United States foreign policy, as it could rely on well-established preemption doctrine to bar such regulations. *See Crosby,* 530 U.S. at 387–88, 120 S.Ct. 2288 ("A failure to provide for preemption expressly may reflect nothing more than the settled character of implied preemption doctrine that courts will dependably apply. . . .").

In *Garamendi,* the Supreme Court discussed the effect of the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015, on the foreign policy preemption analysis of California's HVIRA legislation. 539 U.S. at 427–29, 123 S.Ct. 2374. The Court interpreted the McCarran–Ferguson Act as limiting congressional preemption under the commerce power. *Id.* at 428, 123 S.Ct. 2374. The Court concluded, nevertheless, that "a federal statute directed to implied preemption by domestic commerce legislation cannot sensibly be construed to address preemption by executive conduct in foreign affairs." *Id.* The scope of the section 209(b) waiver seems no broader than the McCarran–Ferguson Act's authorization of state regulation of insurance. Section 209(b) merely provides that the explicit preemption under section 209(a) of any state motor vehicle emissions shall not apply if the EPA properly grants a waiver. 42 U.S.C. § 7543(b). Defendants have pointed to no basis, either in the language or legislative history of the statute, to believe that Congress, in providing for a section 209(b) waiver, contemplated the effects of California emissions regulations on foreign policy and intended endorse such regulations even when they interfered with foreign policy goals.

Defendants do not contend that Plaintiffs, in alleging that the California regulations will impair the President's leverage in pursuing multilateral agreements, have failed to allege sufficient interference with United States foreign policy, should such a policy exist. Instead, Defendants assert that preemption is only appropriate where the state statute concerns "laws or conduct of foreign governments" or "foreign businesses." Defs.' Reply 22:5–6. Defendants point out that the Supreme Court cases finding preemption concern state laws targeting foreign entities. *See Zschernig,* 389 U.S. at 430–31, 440, 88 S.Ct. 664 (probate statute affecting the rights of nonresident aliens and requiring a judicial evaluation that resulted in criticism foreign governments); *Crosby,* 530 U.S. at 376, 120 S.Ct. 2288 (statute exerting economic pressure on the Burmese political regime); *Garamendi,* 539 U.S. at 423–24, 123 S.Ct. 2374 (disclosure requirements designed to apply economic pressure to insurance companies that did business in Europe during World War II).

Defendants focus on language in *Garamendi* that they assert precludes preemption of a generally applicable domestic regulation: "[Q]uite unlike a generally applicable 'blue sky' law, HVIRA effectively singles out only policies issued by European companies, in Europe, to European residents, at least 55 years ago." *Garamendi,* 539 U.S. at 425–26, 123 S.Ct. 2374. Reading this sentence in context, however, indicates that it does not evince the Court's intent to exclude generally applicable laws from conflict preemption. *Id.* Rather, the sentence comes in the context of an analysis of the degree of the state's interest in enforcement of the statute. *Id.* at 425, 123 S.Ct. 2374. The state had contended that the statute's disclosure requirements merely facilitated evaluating corporate reliability. *Id.* at 425–26, 123 S.Ct. 2374. The Court found that the statute's limitation of the disclosure requirement to certain companies' sales to certain types of customers "raises great doubt" as to the validity of the state's expressed purpose. *Id.* at 426, 123 S.Ct. 2374. In other words, because HVIRA's disclosure requirements were not generally applica-

ble, the Court questioned their furtherance of the state's interests in corporate reliability. *Id.* The Court did not speak to whether preemption generally turned on the breadth of the state regulation.

Nothing in the Supreme Court's foreign policy preemption jurisprudence forecloses the possibility of preemption of a generally applicable law that interferes with foreign policy. The focus is on whether the practical effect of the state law is to disturb foreign relations or impair a proper exercise of Presidential authority. *See Crosby,* 530 U.S. at 375, 120 S.Ct. 2288; *Zschernig,* 389 U.S. at 440, 88 S.Ct. 664. Plaintiffs have demonstrated that current Executive Branch policy is to negotiate with other nations to reach agreements regarding greenhouse gas emissions reductions. They have alleged that the California regulations, by unilaterally reducing such emissions, potentially undercut the Executive's ability to pursue such agreements. Accordingly, Plaintiffs have stated a claim for preemption of the regulations based on foreign policy.

## D. Dormant Commerce Clause

By its terms, the Commerce Clause authorizes Congress to "regulate Commerce ... among the several States." U.S. Const., art. 1, § 8, cl. 3. The Supreme Court has interpreted the clause to prohibit states from unduly interfering with interstate commerce absent congressional permission. *See, e.g., Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 441, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The Commerce Clause does not prohibit every exercise of state power that affects interstate commerce. *Gravquick A/S v. Trimble Navigation Int'l,* 323 F.3d 1219, 1224 (9th Cir.2003). This is because, "[i]f the law 'regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only

incidental,' then the statute must be upheld 'unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " *Id.* (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844).

Plaintiffs' Dormant Commerce Clause claim does not allege that California's regulations discriminate against out-of-state interests or directly regulate interstate commerce. *See Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *NCAA v. Miller,* 10 F.3d 633, 638 (9th Cir.1993). Instead, Plaintiffs allege that the regulations are impermissible because they burden "the production and sale of new motor vehicles" while providing "no local environmental benefit, or insubstantial benefits at best." FAC ¶¶ 135, 136.

■ Defendants argue that, if the EPA grants the California regulations a waiver, they cannot violate the Dormant Commerce Clause because they will have been congressionally authorized. Because the Commerce Clause is a grant of authority to Congress, it does not restrict Congress's authority to regulate interstate commerce as it sees fit. *W. & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 652, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981). Accordingly, Congress may authorize states to restrict the flow of interstate commerce in a manner that they would not otherwise enjoy. *Id.* "If Congress ordains that the States may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge." *Id.* at 652–53, 101 S.Ct. 2070; *White v. Mass. Council of Constr. Employers,* 460 U.S. 204, 213, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) ("Where state or local government action is specifically authorized by Congress, it is not

subject to the Commerce Clause even if it interferes with interstate commerce."). The Supreme Court has set a rigorous standard for finding congressional intent to authorize state laws that violate the Commerce Clause. "Congress must be 'unmistakably clear' before we will conclude that it intended to permit state regulation which would otherwise violate the dormant Commerce Clause." *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 408, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (O'Connor, J., concurring) (quoting *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984)). Courts may look to the language of the relevant statute and the legislative history to find this intent. *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 960, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982). The state bears the burden of demonstrating this intent. *Wyoming v. Oklahoma,* 502 U.S. 437, 458, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992).

 It is undisputed that, on its face, Clean Air Act section 209(b) authorizes California to implement emissions regulations upon receiving an EPA waiver. The terms of section 209(b) indicate that it only shields such regulations from "application of this section," referring to the broad preemption under section 209(a). *See* 42 U.S.C. § 7543. Defendants point instead to legislative history to demonstrate Congress's intent to immunize California regulations from a Dormant Commerce Clause challenge. They contend that when Congress conferred on California the authority to set standards applicable to automobile manufacturers selling cars in California, it knew that California would regulate a significant aspect of interstate commerce.

The District of Columbia Circuit summarized the history of California's Clean Air Act waiver in *Motor & Equipment Manufacturers Association v. EPA,* 627 F.2d 1095, 1109–10 (D.C.Cir.1979). The debate in the Senate over granting California a broad waiver "sharpened the differences between the states, which wanted to preserve their traditional role in regulating motor vehicles, and the manufacturers, which wanted to avoid the economic disruption latent in having to meet fifty-one separate sets of emissions control requirements." *Id.* at 1109. As the Senate Committee presenting the bill acknowledged, "[t]he auto industry ... was adamant that the nature of their manufacturing mechanism required a single national standard in order to eliminate undue economic strain on the industry." *Id.* (citing S.Rep. No. 90–403, 33 (1967)). "Thus the Committee that formulated the waiver provision understood the costs involved in making an exception" but reported that the drawbacks of the waiver were balanced by the "benefits for the Nation to be derived from permitting California to continue its experiments in the field of emissions control ... and the benefits for the people of California to be derived from letting that State improve on 'its already excellent program' of emissions control." *Id.* at 1109–10.

The House also considered the far-reaching economic implications of the waiver provision. The House Committee was so concerned "that the separate administration of two different sets of emission regulations would unduly burden the industry," that it amended the waiver provision to make the Secretary's action permissive, rather than mandatory. *Id.* at 1121 (citing H.R.Rep. No. 90–728, 21–22 (1967)). On the floor of the House, the bill was amended to replace the House Committee language and revert to that of the original Senate proposal. *Id.* (citing 113 Cong. Rec. 30975 (1967) (remarks of Rep. Moss)). The House ultimately adopted the amendment, agreeing with the Senate to place the burden on those "on those who allege, in effect, that the national program is adequate to California's needs." *Id.*

The legislative history makes clear that both the House and the Senate considered that the California regulations under the waiver would substantially burden interstate commerce. Nevertheless, realizing the benefits for California and for the nation from allowing the state broad authority, Congress enacted the waiver anyway. One judge in this district and a California Court of Appeal have concluded that Congress intended regulations that receive a section 209(b) waiver to be immune from Dormant Commerce Clause scrutiny. *Oxygenated Fuels Ass'n v. Davis*, 163 F.Supp.2d 1182, 1188 (E.D.Cal.2001), *aff'd*, 331 F.3d 665 (9th Cir.2003) (holding that Congress's authorization of California's regulation of fuels and fuel additives upon receiving a section 209(b) waiver rendered the state law "not subject to the Commerce Clause" (quoting *White*, 460 U.S. at 213, 103 S.Ct. 1042)); *People ex rel. State Air Res. Bd. v. Wilmshurst*, 68 Cal. App.4th 1332, 1345, 81 Cal.Rptr.2d 221 (1999) (Congress's intent to "allow California to forge emissions standards at variance with the rest of the United States" meant that a California regulation receiving an EPA waiver was not vulnerable to a Commerce Clause challenge (citing *Motor and Equip. Mfrs. Ass'n*, 627 F.2d at 1128.)).

Plaintiffs do not take issue with Defendants' characterization of the legislative history of section 209(b). Plaintiffs do not dispute that, at the time Congress passed the waiver provision, it intended to permit California, with EPA approval, to implement regulations burdening interstate commerce. Plaintiffs contend instead that, in deciding whether Congress intended to permit the California regulations even if they burden interstate commerce, the court should also consider the extent to which the EPCA demonstrates a congres-

sional intent to protect interstate commerce in vehicle production from state fuel economy regulation. Plaintiffs point to the express preemption provision, 49 U.S.C. § 32919(a), as well as other provisions requiring administration of the CAFE program in a manner that does not economically harm the automobile manufacturing sector. *See* 49 U.S.C. §§ 32913, 32916. Plaintiffs contend that the holdings of *S. Life Ins. Co.* and *White* do not apply where there is "no clear expression of Congressional intent to approve any type of state regulation." Pls.' Opp'n 66:9–11.

Because they do not dispute the District of Columbia Circuit's interpretation of the legislative history of the Clean Air Act, Plaintiffs must find in the EPCA Congress's intent to revoke the permission to burden interstate commerce that it had previously given California. The EPCA sections to which Plaintiffs cite do not evince such congressional intent. Plaintiffs point to 49 U.S.C. § 32913, which concerns civil penalties for failing to comply with requirements under the EPCA. It authorizes the Secretary of Transportation to reduce such a penalty to the extent "necessary to prevent a substantial lessening of competition." 49 U.S.C. § 32913. Plaintiffs also cite a requirement that the Secretary, after providing a manufacturer an exemption from "the requirement of separate calculations" should evaluate the economic effect of such an exemption. 49 U.S.C. § 32916. Neither of these provisions illuminates Congress's intent regarding the economic effects of regulations waived under Clean Air Act section 209(b). Nor does the EPCA's express preemption provision, 49 U.S.C. § 32919(a), explicitly or implicitly bear on Congress's belief that the benefits of more stringent California emissions regulations justify a burden on commerce.[16] Taken together in light of

---

16. Of course, it is undisputed that should the California regulations be subject to the

EPCA's preemption provision, they will be barred.

the legislative history of section 209(b), the EPCA provisions that Plaintiffs cite do not contravene Congress's "unmistakably clear" permission to California to burden interstate commerce. *See C & A Carbone,* 511 U.S. at 408, 114 S.Ct. 1677. Accordingly, Plaintiffs do not state a claim under the Dormant Commerce Clause, making judgment on the pleadings for Defendants appropriate.

### E. Sherman Act

In their opening brief, Defendants moved for judgment on the pleadings on Plaintiffs' claim under the Sherman Act on the basis that they had failed to state a facial preemption challenge. In their opposition brief, Plaintiffs concede that they have not stated a claim for a facial challenge to the California regulations. Pls.' Opp'n 67:21–22. Instead, they seek to "prove specific anticompetitive effects that trigger preemption under the Sherman Act." *Id.* In their reply, Defendants contend that Plaintiffs have failed to state a claim for such an as-applied challenge and, in the alternative, that such a claim is unripe.

 Under section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations," is illegal. 15 U.S.C. § 1. To establish a section 1 violation, a plaintiff must demonstrate three elements:

> (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., "antitrust injury").

*McGlinchy,* 845 F.2d at 811. Where two parties to an alleged conspiracy actually constitute a "single entity," they are immune from section 1 liability, as the "company cannot conspire with itself." *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133, 1147 (9th Cir.2003) (citing *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). "Where there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity." *Id.*

The FAC alleges that the California regulations may lead to price fixing. FAC ¶ 143. This is because the regulations, in some cases, require companies with a ten percent or greater overlap in ownership, but which are not one economic unit, to jointly demonstrate compliance with the greenhouse gas emissions limits. *Id.* The FAC alleges that manufacturers control the mix of vehicles sold by raising and lowering prices to influence demand for particular vehicle groups or models. *Id.* In order to control the aggregate emissions of the vehicles sold, the FAC alleges, "the two manufacturers will need to coordinate the sale of vehicles according to their fuel economy." *Id.* This will require, according to the FAC, the exchange of production, supply, and price information, which could ultimately result in price fixing. *Id.*

 Generally, the Sherman Act does not constrain "a state or its officers or agents from activities directed by its legislature." *Parker v. Brown,* 317 U.S. 341, 350–51, 63 S.Ct. 307, 87 L.Ed. 315 (1943). This is because the Sherman Act does not evince Congress's intent to "nullify a state's control over its officers and agents." *Id.* at 351, 63 S.Ct. 307. Conse-

quently, the *Parker* Court decided, based on principles of federalism and state sovereignty, that the acts of a state's legislative power or "official action directed by a state" are not subject to Sherman Act scrutiny. *Id.* A state statute may, however, be preempted where "there exists an irreconcilable conflict between the federal and state regulatory schemes." *Rice v. Norman Williams Co. (Rice)*, 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982).

■■■ *Rice* concerned the enforceability of a state scheme involving licensing of beverage importers. *Id.* at 656–57, 102 S.Ct. 3294. The Court held that it was irrelevant to the inquiry into the validity of the statute whether it "might have an anticompetitive effect when applied in concrete factual situations." *Id.* A consideration of the effects of a state statute may be relevant to determining whether a private individual is entitled to the "state action" exemption to Sherman Act liability. *See Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97, 103, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (citing *Parker*, 317 U.S. at 351, 63 S.Ct. 307). Plaintiffs do not present any authority, and the court is aware of none, suggesting that anticompetitive effects short of "irreconcilable conflict" are grounds for preemption of a state statute.[17] *See Rice*, 458 U.S. at 659, 102 S.Ct. 3294. To the contrary, only "[w]hen the plaintiff challenges the facial validity of a statute or ordinance, preemption principles come into play. Where, however, the plaintiff alleges that action taken pursuant to legislation constitutes an antitrust viola-

tion, preemption principles are not implicated, while the state action doctrine can provide protection." 3 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation* § 49.06[2] (2d ed.2004).

■■■ Preemption based on "irreconcilable conflict" under *Rice* represents an exception to the well-established rule that a state's actions are exempt from section 1 scrutiny. *See* 458 U.S. at 659, 102 S.Ct. 3294. Plaintiffs do not point to any other grounds to invalidate the California regulations. Thus, while, "specific anticompetitive effects" of the California regulations might ameliorate the liability of manufacturers forced to engage in anticompetitive activities to comply with them, principles of federalism and state sovereignty preclude invalidating all or part of the statute based on such effects. Because Plaintiffs concede that *Rice* preemption of the regulations is inappropriate and no other grounds for Sherman Act preemption are before the court, the court grants judgment on the pleadings for Defendants on this claim.

**F. Global Warming Science Discovery**

■■■ In its order issued September 11, 2006, the court granted Defendants' motion for reconsideration with respect to certain discovery orders of the Magistrate Judge. The court concluded, in the section entitled "Global Warming," that certain document requests[18] were permissible because they were likely to lead to the production of evidence relevant to Plaintiffs' Dormant Commerce Clause chal-

---

**17.** Plaintiffs' attempts to resuscitate this claim, both in their opposition brief and at oral argument, centered on presenting authority indicating that a preenforcement as-applied challenge to a state statute is generally permissible. *See Compassion in Dying v. Washington*, 79 F.3d 790, 798 (9th Cir.1996). Such authority is unhelpful to Plaintiffs as they have not demonstrated any statutory ba-

sis for preemption of the California regulations under the Sherman Act.

**18.** These requests include those designated GM 22/DCC 21/AAM 20, GM 23/DCC 22/AAM 21, GM 25/DCC 24, GM 26/DCC 25/AAM 24, GM–DCC–AAM 8, 9, 10 and 11, GM 20/DCC–AAM 19, GM 14, and GM 15/DCC–AAM 14.

lenge, on which judgment on the pleadings has now been granted. *See* Fed.R.Civ.P. 26(b)(1); Fed.R.Evid. 401. In opposing the motion for reconsideration, Defendants had also contended that the document requests were permissible to seek evidence refuting AIAM's claim that EPA cannot find, under 42 U.S.C. § 7543(b)(1)(B), "compelling and extraordinary conditions" justifying a waiver. *See* AIAM Compl. ¶ 62. As Judge Coyle made clear in his order of October 21, 2005, whether EPA will ultimately decide to grant the California regulations a waiver is not properly before this court. Accordingly, the court finds that, notwithstanding any prior order, document requests that seek evidence about the science of global warming are not, on that basis, reasonably calculated to lead to evidence admissible in this action.

### CONCLUSION AND ORDER

For the reasons stated in the above Memorandum Opinion, IT IS HEREBY ORDERED that:

1. Defendants' motion for JUDG-MENT ON THE PLEADINGS is DENIED with respect to the claims for EPCA preemption, EPA preemption, and foreign policy preemption;

2. Defendants' motion for JUDG-MENT ON THE PLEADINGS is GRANTED with respect to the Dormant Commerce Clause and Sherman Act claims; and

3. Notwithstanding any prior order of this court, Plaintiffs need not produce documents responsive to requests designated GM 22/DCC 21/ AAM 20, GM 23/DCC 22/AAM 21, GM 25/DCC 24, GM 26/DCC 25/ AAM 24, GM–DCC–AAM 8, 9, 10 and 11, GM 20/DCC–AAM 19, GM 14, and GM 15/DCC–AAM 14.

IT IS SO ORDERED.